LOLLEY, J.
 

 11 This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana. The defendant, Mario Stewart, was convicted of second degree murder, a violation of La. R.S. 14:30.1, and was sentenced to the mandatory term of life imprisonment without parole. He appeals his conviction and sentence, which we affirm for the following reasons.
 

 Facts
 

 At about 9:00 p.m. on December 24, 2003, the Robins family was at their home on Lowery Road in rural Caddo Parish when the family members heard a series of gunshots outside. The family went outside and found a man, later identified as Curtis Ewing, lying on the ground bleeding.
 

 Paramedics responded to the call and found Ewing to be badly wounded; they called for a helicopter transport. One of the responders, Deputy Chief Jefferson Akes, noticed that the victim had duct tape on his right arm. The victim was able to convey his name and address to Dep. Akes, but his condition steadily deteriorated despite immediate care from the medics. Ewing was gravely wounded. Deputies from the Caddo Parish Sheriffs Office arrived at the scene and asked the victim
 
 *717
 
 what happened to him. Ewing was reluctant to speak, but Dep. Akes told the victim that if he had something to say, “he needed to tell us right now ... this might be your last time to tell anybody.” According to Dep. Akes, he had this conversation with the victim:
 

 [T]hey came to his house and got him. And I was like ... what do you mean they came to your house, did they snatch you off the street, he said, “no,” he got in the car with them, and they had taken him out there. I remember asking him ... |2who did this to you, and the only thing he would say was “Mario,” that’s the only thing I heard him say.
 

 Another one of the deputies who responded, Deputy Joel Griffin, testified:
 

 Initially, he was just saying he was hurting, he was in a lot of pain, and I said, sir, I understand that, as far as I know right now we don’t have any known witnesses, it’s very important for you to answer the question. And then I said, do you know who shot you, and he said “Mario,” and I said “Mario,” and he nodded. He said, “yeah, Mario.”
 

 Still another investigator with the Sheriffs office, Sergeant Micky McDaniel, spoke with the victim at the scene. He said that Ewing was able to give him his date of birth, and then Sgt. McDaniel had this exchange with the victim:
 

 I asked him again, Curtis, who shot you, and he told me “Mario.” And I said “Was Mario with anyone?” and he said, “yes, a black male, yes,” “do you know his name?,” “no.” I asked him about the vehicle and he told me it was a blue Ford Escort that they had come to the scene in, and I asked him where they had come from, and he told me [Mooretown].
 

 The helicopter arrived and paramedics transported Ewing to LSU Medical Center, where he died of his wounds. Investigators gathered a number of items of evidence from the scene including several spent .45 cartridge cases and a Styrofoam cup. In addition, a doctor who treated Ewing gave an investigator bullets the doctor extracted from the body.
 

 The deputies’ investigation of the crime led them to Mario Stewart and his friend Drexell Tolliver. Stewart and Tolliver ultimately turned themselves in for questioning. After taking the men’s statements, investigators arrested them for Ewing’s murder. Stewart eventually admitted that he had picked up Curtis Ewing that evening but denied that he |ashot the victim. He first claimed that he, Tolliver and Ewing had planned to rob a drug dealer but that Tolliver discovered that Ewing was carrying a large sum of cash so Tolliver decided to rob Ewing. The defendant claimed that he then left the men’s company and that Tolliver and Ewing drove off together, and that Tolliver later returned, alone, to pick up the defendant. Later, he claimed to have been part of a plan with Tolliver to rob, but not kill, Ewing, and said that Tolliver was the one who duct taped Ewing’s arms prior to the killing.
 

 Stewart was initially indicted for the first degree murder of Curtis Ewing, but the indictment was later amended to second degree murder, a violation of La. R.S. 14:30.1. On January 12, 2009, a jury trial against Stewart commenced.
 

 At the trial, the victim’s brother, Clifton Ewing, testified that prior to his brother’s murder on December 24, 2003, he was at his aunt’s house in Shreveport when Stewart came to the door and asked to speak with the victim, whom Stewart explained he knew “from middle school.” Clifton said that his brother spoke with Stewart and then got into the car with him. Clifton recalled that Stewart and his brother
 
 *718
 
 were the only people in the car, a Ford Escort, when they drove away. That was the last time that Clifton saw his brother alive. Ewing identified the defendant in a photo lineup as the person who left with his brother.
 

 Stewart’s girlfriend, Shaqueta Datcher, testified that on December 24, 2003, at about 5:00 p.m., the defendant, who was by himself, came to her home and borrowed her car, a Ford Escort. Datcher stated that Stewart | Returned with the car later that night at about 10:00 p.m., and he was accompanied by two men, Tolliver and Jhi-marcus Mitchell. The three men stayed at Datcher’s home for about 30 minutes and then left on foot. Datcher used her car to go to her cousin’s house later that night but did not notice anything unusual about her car.
 

 Yashika Bennett, Datcher’s cousin, was also at Datcher’s house that night. Bennett also testified at trial and remembered that Stewart picked up the car between 8:30 and 9:00 p.m. and returned, alone, at 10:30 or 11:00 p.m.
 

 After examining the physical evidence, investigators found fingerprints on the Styrofoam cup. The fingerprints were identified as Tolliver’s. A search of Datcher’s car revealed blood spots, several pieces of duct tape in the back of the car and the defendant’s fingerprints above the trunk latch, on the passenger’s side roof, and the driver’s side door glass. The murder weapon was never recovered.
 

 Stewart never admitted to police that he shot the victim. Tolliver gave police several statements with very different versions of the facts. In the first statement, he denied any knowledge of the events. In the second statement, Tolliver admitted to shooting the victim. In the third statement, he said that the defendant shot the victim, and in the fourth statement, he said that he cooperated with Stewart, who shot the victim, as part of a contract killing paid for by two men whom the victim had wronged. In Tolliver’s statements, he had no specific knowledge about the murder | ¿weapon; however, in Stewart’s statements, he knew that the weapon was a .45.
 

 Tolliver testified at the defendant’s trial. Tolliver told the jury that he was originally charged with murder because of his involvement in this offense, but had pled guilty to manslaughter and had been promised a sentence of between 20 and 40 years’ imprisonment after his testimony in the defendant’s trial. He admitted giving different statements to investigators, including admitting to the shooting itself, but he explained that he did so because the investigators continued to assert that Tol-liver was guilty of the murder.
 

 Tolliver told the jury that on Christmas Eve, he was in a car outside Stewart’s uncle’s house when he saw Stewart pull up in Datcher’s car. As Tolliver got into the car, he saw Stewart with a gun pointed at the victim, who was on the passenger’s side floorboard with his face “cut up.” Tolliver related that the defendant said that Ewing had robbed a person he knew as “Marcus.” Tolliver believed that they were taking the victim to Marcus “to beat him up or whatever.” Tolliver never saw any duct tape on the victim. Tolliver got into the back seat, and the men drove out into the country. Tolliver told the defendant that he (Tolliver) had to urinate, so the defendant pulled off the road. Tolliver said that he put down his drink cup and that he walked away from the car, and when he looked back:
 

 I seen them struggling like they was pushing each other and the door come open, and as I’m looking for the truck I see Mario jump out behind Curtis, which he had got out and started running, and that’s when I seen him shoot.
 

 
 *719
 
 | (jTolliver said that he and Stewart got back into the car, and the defendant gave Tolliver some of Ewing’s money and showed him Ewing’s cell phone. Tolliver related that Stewart drove them back to Shreveport to his uncle’s home to try to get rid of the gun, but that the uncle refused to take the gun from Stewart. They then drove to another home where the defendant talked to the person he knew as Marcus, a.k.a. “Cool Mark,” and that afterward Stewart gave Tolliver $200.00, which Tolliver understood to be payment “not to say nothing about everything that happened.” After that, he and the defendant went to Datcher’s house.
 

 The state’s next witness was Danny Daniels, who had been incarcerated at Caddo Correctional Center contemporaneously with Stewart and had met him during their recreational time there. Daniels said that he understood that, for his testimony at the defendant’s trial, the prosecutor might write a letter to the federal officials explaining Daniels’ cooperation with the instant case, but that such a letter would have no binding effect on the federal drug charges against him.
 

 Daniels had been close friends with one of Stewart’s cousins and knew Stewart’s father, so the two spoke to each other during their free time in jail. Daniels said that over the course of several conversations, Stewart told him:
 

 Curtis [the victim] had started ... doing a lot of armed robberies around Shreveport, robbing mostly drug dealers, and that Curtis he had started robbing people out [sic] his own neighborhood, and he told me he was hired and paid to kill Curtis behind those robberies.
 

 [[Image here]]
 

 17[He] told me that Curtis wouldn’t suspect what was going on because all of them was pretty much from the same area, and he told me that he had told Curtis that they was going to hit a lick, a robbery, you know, to lure him in. And basically he told me that him and a guy named Drex and Curtis was in his girlfriend [sic] car because he was worried, you know, he didn’t want no backlash to come back on his girlfriend. That he was in his girlfriend car, and that he took him off and shot him in the chest.
 

 [[Image here]]
 

 He just told me that he wish [sic] he would have shot him in the head instead of the chest because now he may be facing a life sentence.
 

 Two other inmates, who claimed to have spoken with Tolliver, also testified. Daniel Gay, Tolliver’s cell mate, reported that Tolliver “stated that the guy, Curtis, that the victim was killed, he stated that Curtis mention Mario name, so he was going [to] send Mario down.” Gay also said that Tol-liver admitted shooting the victim, and that Tolliver said that “after the gun was pulled, he stated that Mario like was acting like he didn’t want to have anything to do with the situation ... he started to walk off from it, but due to fact that he was the one that was driving the car he couldn’t really go far.” Gay said that Tol-liver said nothing about a robbery.
 

 The other inmate to testify was Jonathan Black. He also had been a cell mate of Tolliver and Gay. He said that Tolliver “always talk about how he felt bad about dragging Mario into the situation or whatever .... ” “Mario seen what was taking place ... he telling me how everything was unfolding ... how he didn’t like the situation, he didn’t want to have nothing to do with it.” Black said that Tolliver admitted shooting the victim. |s Tolliver denied speaking to these men about his case,
 
 *720
 
 and both men would have had access to Tolliver’s case file which was in the cell with him.
 

 In closing argument, the prosecutor argued both that Stewart was the person who shot the victim and that Stewart was a willing participant in the kidnaping and armed robbery of the victim that ended in the victim’s murder. The jury found Stewart guilty as charged, and the trial court subsequently sentenced Stewart to serve “life imprisonment without the benefit of probation, parole or suspension of sentence in accordance with the mandatory sentencing of second degree murder.” This appeal by Stewart ensued.
 

 Discussion
 

 Sufficiency of the Evidence
 

 In a
 
 pro se
 
 assignment of error, Stewart argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Specifically, he argues that the evidence was insufficient because Tol-liver’s testimony was incredible due to his multiple conflicting statements.
 

 When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of |9the elements of the offense have been proved beyond a reasonable doubt.
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347,
 
 writ denied,
 
 1997-1203 (La.10/17/97), 701 So.2d 1333.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir.02/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La. App.2d Cir.01/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/09/06), 941 So.2d 35. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.05/09/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 

 An accomplice is a competent witness to testify against a co-perpetrator even if the prosecution offers the accomplice inducements to testify; these inducements weigh on the witness’s credibility.
 
 State v. Jetton,
 
 32,893 (La.App.2d Cir.04/05/00), 756 So.2d 1206,
 
 writ denied,
 
 2000-1568 (La.03/16/01), 787 So.2d 299. The credibility of an accomplice’s testimony is not within the province of the court of appeal to decide.
 
 Id.
 
 Rather, credibility evaluations are within the province of the trier of fact.
 
 Id.
 
 The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the |1fltestimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 1999-0023 (La.01/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104,148 L.Ed.2d 62 (2000).
 

 The jury was made aware, in excruciating detail, of the variations in Tolliver’s various statements and, in addition, the jury was aware that Tolliver had received
 
 *721
 
 a favorable plea bargain in exchange for his testimony. The jury heard and watched Tolliver testify, and it apparently chose to credit his testimony, at least in part. The evidence was clearly sufficient to prove the defendant’s guilt of second degree murder. Stewart admitted his participation in the robbery of Ewing, but denied that he assented to the murder. The jury’s choice to believe otherwise, particularly in light of the victim’s dying declaration that “Mario” shot him, was clearly within their province. So considering, we conclude that this assignment of error is without merit.
 

 Use of Incriminating Statements
 

 In an assignment of error raised by his appeal counsel, Stewart argues that the state’s discovery response informing him of the existence of Daniels as a witness was untimely and prejudicial so as to warrant reversal of his conviction. We disagree.
 

 Early in the prosecution against Stewart, in 2004, he filed a comprehensive motion for discovery. From the beginning, the state provided a comprehensive set of discovery materials to Stewart, including lineups, police reports and transcripts of statements by the defendant and InTolliver. Likewise, the state gave Stewart notice, pursuant to La.C.Cr.P. art. 768, of its intent to use at trial “any statements made by the defendant and/or co-defendants, including
 
 res gestae
 
 statements, which are referred to in the attached reports.” Over the course of the next two years, the state supplied Stewart with another 1,000 pages of discovery, along with additional notices that it intended to use his statements against him.
 

 Stewart’s trial was originally scheduled for May 19, 2008.
 
 [1]
 
 The trial judge upset the trial date and refixed the case for August 18, 2008; ultimately, the trial was continued until January 12, 2009.
 

 On the second day of trial, January 13, 2009, the state informed the court and Stewart that it intended to file a supplemental notice of intent under La.C.Cr.P. art. 768 regarding an additional statement. The prosecutor explained:
 

 Last month I was contacted by a federal inmate who was incarcerated in Seago-ville, Texas. He indicated that through an intermediary that he might have information that would help the case. Out of an abundance of caution, to not leave any avenue uninvestigated, I initiated the procedure for having him brought into Caddo Parish, but the timing was such that I would not have an opportunity to meet with him prior to trial. I, Mr. Langford and I, met with this witness today. He indicated he was incarcerated with Mr. Stewart. I did some brief legal research.
 

 112At this time we are filing our notice of intent to use statements under Article
 
 *722
 
 768, specifically the statement made by Mr. Stewart to Mr. Daniels while they were incarcerated. I believe that-I didn’t have this information until today. I hadn’t talked to the guy, didn’t know what he was going to say. I am filing a notice, there is no formal prepared statement. There was no discovery on this because we were unaware of this witness’ testimony. I just advised the court that based on my preliminary review of the research under these circumstances that evidence has generally been held to be admissible, the thinking being that the defendants-if he made the statements, his defense is that, well, he should have known what he said to people, and if he didn’t then, you know, pretty much the only thing he can do is deny the claim.
 

 Stewart objected to the use of the statements based on the short notice and because he did not know the substance of the statements, he did not know how to prepare a defense. The state informed Stewart that Daniels was incarcerated locally and could be interviewed. In response to a question from the court, the prosecutor said that he first became aware that Daniels might have useful information in a letter from Daniels received “at the beginning of last December [2008]” and that, at that time, Daniels provided no details about what he knew. The prosecutor said that he could look around in his office for the original letter from Daniels.
 

 At that point, the prosecutor informed the trial court and Stewart about the substance of Daniels’ testimony; namely, his claim that the defendant had admitted to Daniels that he had taken money to kill the victim and that he, not Tolliver, was the shooter. Stewart again objected to the use of this testimony given the late notice and recalled, on the record, that the prosecutor had made a reference in the past year to some information about an inmate with information about the case and suggested that the prosecutor should have had time to get the information earlier. Further, he said that on |1sthe previous day, the prosecutor simply said “yes” when asked if he was ready for trial despite having had this federal inmate transported to Shreveport to supply unknown information.
 

 In a memo filed the next day, the prosecutor indicated that he received the original letter from Daniels in October 2008-the letter was never produced. The court held a brief hearing, where the state argued that it had supplied Stewart with the information when it became available and had provided him with the required notice. Stewart argued that he was only aware that the state might possibly have an inmate witness but had no idea of the witness’s name or what the witness would say. Stewart objected again to the testimony of the witness. Based on its research, the trial court decided to allow the witness to testify because the state had supplied him with notice of the statement prior to the opening statement. Stewart objected to the trial court’s ruling but did not ask for a recess; as noted, the court allowed Daniels to testify.
 

 Louisiana C.Cr.P. art. 768 provides:
 

 Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state’s opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
 

 Louisiana C.Cr.P. art. 716 provides, in part:
 

 A. Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to
 
 *723
 
 inspect and copy, photograph or otherwise reproduce any relevant written or recorded confession or statement of any nature, including recorded testimony before a grand jury, or copy thereof, of the defendant in the possession, custody, control, or knowledge of the district attorney.
 

 |UB. Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
 

 See also La.C.Cr.P. art. 729.3.
 

 The purpose of discovery rules in criminal trials is to eliminate unwarranted prejudice from surprise testimony.
 
 State v. Williams,
 
 25,835 (La.App.2d Cir.02/23/94), 632 So.2d 893. As this court explained in
 
 Williams:
 

 The failure of the state to comply with the discovery procedure will not automatically command reversal. The defendant must show prejudice in order for his conviction to be reversed.
 

 Sanctions for failure to comply with discovery motions are solely within the discretion of the trial judge and reversal is warranted only when there is an abuse of discretion and prejudice is shown. Granting a recess to enable the defendant to prepare to meet the newly-revealed evidence may be an appropriate remedy.
 

 The court will review the record for a determination of whether any prejudice which may have resulted from the noncompliance caused the trier of fact to reach the wrong conclusion.
 

 Although there is a continuing duty of disclosure, there is no duty on the part of the state to disclose information which it does not possess. Therefore, exclusion of the evidence is a sanction which is not available where the state has promptly informed the defendant of the receipt of additional evidence, even though the new material is uncovered at an inopportune time for the defense. (Citations omitted.)
 

 When the defendant is lulled into misapprehension of the strength of the State’s case through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results which | ^constitutes reversible error.
 
 State v. Mitchell,
 
 412 So.2d 1042, 1044 (La.1982).
 

 On appeal, Stewart’s principal complaint is that the state failed to give him timely notice of the October 2008 letter from Daniels informing the state that Daniels had helpful information about its case. He argues that the trial court erred in accepting the state’s argument that the prosecutor provided notice when that notice was available, because the prosecutor knew in October 2008 that a witness had information that the witness deemed helpful. Second, he argues that the state was aware of the substance of Daniels’ testimony at least several days prior to the commencement of trial.
 

 The record tends to show that the prosecutor believed that whatever information Daniels had may have been important because the prosecutor caused him to be moved from federal prison in Texas just prior to the trial. However, the prosecutor informed the court that he was unaware of the substance of what Daniels would know until he met with the witness on the second day of trial. It does not appear that the prosecutor knew of the substance of Daniels’ testimony for several days prior to providing notice. Further,
 
 *724
 
 the record tends to show that the prosecutor was diligent in supplying Stewart with other similar information when it was received; the state informed the defendant about inmate Gay’s offer several days pri- or to the scheduled commencement for trial and did not object to a continuance based on that testimony. There is no indication in the record that the late 1disclosure was intentional; instead, it appears to have been the result of the unexpected fruit of last-minute investigation by the prosecutor.
 

 The trial court informed Stewart’s attorney that he had the opportunity to interview the witness prior to the commencement of trial, and counsel did not ask the court for a recess to conduct that interview. The late disclosure of the evidence, although unfortunate, was neither deliberately done nor fundamentally unfair to the defendant. Further, the defendant was allowed the full cross-examination of the witness, and he had ample opportunity to show the jury that the witness had hopes of receiving leniency in exchange for his testimony. So considering, the trial court’s resolution of this issue does not present reversible error.
 

 Autopsy Report
 

 Stewart also argues
 
 pro se
 
 that the trial court erred in allowing the jury to view the autopsy report in the absence of testimony from the coroner. The autopsy report introduced into evidence was a certified document; the trial court allowed it into evidence under La.C.Cr.P. art. 105 and
 
 State v. Russell,
 
 42,479 (La.App.2d Cir.09/26/07), 966 So.2d 154,
 
 writ denied,
 
 2007-2069 (La.03/07/08), 977 So.2d 897.
 

 A coroner is required to make a written report of his investigation to the district attorney in any case involving a homicide. La.C.Cr.P. art. 105. Pursuant to article 105, such a report is excepted from the hearsay rule and may be admitted in evidence as proof of death and the cause thereof.
 
 State v. Trahan,
 
 576 So.2d 1, 9 (La.1990);
 
 State v. Russell, supra.
 
 When a coroner’s report is admitted without the testimony of the coroner as to the | ^authenticity of the report and when the report is cumulative evidence as to death and cause of death of a victim, there is no substantial violation of the defendant’s statutory or constitutional rights.
 
 State v. Vincent,
 
 338 So.2d 1376 (La.1976);
 
 State v. Russell, supra.
 

 There was no dispute that the victim in this case had been shot-the Robins family heard gunshots and found Ewing bleeding to death outside. Although paramedics attempted to save his life, the victim suffered gunshot wounds that ultimately killed him. The coroner’s report was simply cumulative evidence of the victim’s un-controverted death and cause of death. Furthermore, even if there was any error regarding Stewart’s right to confrontation, it was harmless beyond a reasonable doubt; numerous witnesses attested to the victim’s condition at the scene of the crime and there was no doubt that the victim died as a result- of his multiple gunshot wounds. This assignment of error is without merit.
 

 Violation of Right to Confrontation
 

 In another
 
 pro se
 
 assignment of error, Stewart argues that the trial court should not have allowed into evidence photographs of the bullets extracted from the victim in the absence of testimony from the physician who removed the bullets from the victim’s body. He maintains that his right of confrontation was violated and that the physician should have been called to testify regarding the bullets removed from the victim.
 

 The Confrontation Clause of the Sixth Amendment provides that, “[in] all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” This bedrock procedural [ 1sguarantee applies to both federal
 
 *725
 
 and state prosecutions.
 
 Pointer v. Texas,
 
 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965);
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Sixth Amendment safeguards the defendant’s right to confront his accusers and to subject their testimony to rigorous testing in an adversary proceeding before the trier of fact.
 
 California v. Green,
 
 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970);
 
 State v. Kennedy,
 
 2005-1981 (La.05/22/07), 957 So.2d 757,
 
 reversed in part on other grounds, Kennedy v, Louisiana,
 
 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008);
 
 see also
 
 La. Const. Art. 1, § 16.
 

 Confrontation errors are subject to the harmless error analysis, so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error.
 
 State v. Broadway,
 
 1996-2659 (La.10/19/99), 753 So.2d 801, 817,
 
 cert. denied,
 
 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).
 

 Here, any error by the trial court on this point was harmless beyond a reasonable doubt. At trial, Sgt. Malcolm Laing of the Caddo Parish Sheriffs Office stated that two bullets had been extracted from Ewing. He testified that he waited at the hospital to obtain the bullets “in order to see about getting those to the crime lab to have them analyzed in case we were able to recover the weapon.” He also explained why and how he photographed the bullets. Notably, the gun used to killed Ewing was never located; thus the bullets were not used to link the murder weapon to Stewart. They were essentially an evidentiary deadend. The photos of the |19bullets did not prejudice the defendant in any way, but were just additional support to prove the undisputed fact that the victim had been shot several times and died of bullet wounds. In fact, when weighed against the other evidence against Stewart, particularly the statements that Stewart was the shooter, the bullets were not at all critical in reaching a guilty verdict against this defendant. This assignment of error is without merit.
 

 Sentencing
 

 Finally, Stewart also argues
 
 pro se
 
 that the trial judge erred in his failure to commit him to the Department of Corrections to serve his term of imprisonment. It is difficult to understand exactly what Stewart is arguing in this assignment. He cites La. R.S. 15:824 relating to the commitment of persons to the Department of Public Safety and Corrections and urges that his sentence is somehow insufficient. Except for the court’s omission of the term “hard labor” from Stewart’s sentence, it appears perfectly appropriate, and since the sentence for second degree murder must necessarily be served at hard labor, the sentence is not indeterminate. This assignment of error is without merit.
 

 Conclusion
 

 For the above reasons, we affirm the conviction and sentence of Mario Devon Stewart.
 

 AFFIRMED.
 

 [1]
 

 . On May 7, 2008, the state provided him with an "evidentiary disclosure” providing notice that the state had received a letter dated September 24, 2007, which was attached, from counsel for an individual named Daniel Gay. The letter said that Gay had been Tolliver’s cell mate and that Tolliver had made certain incriminating statements to Gay concerning his involvement in the shooting death of the victim "and that his co-defendant was not the shooter.” Gay, who had two pending drug charges in Caddo Parish, was asking for "some arrangements” concerning his own pending drug charges in exchange for his testimony. The state’s notice to Stewart indicated that the state had determined that it would not pursue "this investigative avenue for its case against” Tolliver. The notice further provided that Tolliver may now testify as a witness for the state.
 

 On May 15, 2008, Stewart filed a motion for a continuance, stating that he needed additional time to investigate and explore the information provided by the State regarding Gay’s statements. The motion was granted.