STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

13-469

STATE OF LOUISIANA

VERSUS

WILLIAM KING, III

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, DOCKET NO. 09-5228
HONORABLE JAMES P. DOHERTY, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Judges Sylvia R. Cooks, Marc T. Amy and Billy H. Ezell.

**Affirmed.**

Hon. Earl B. Taylor, District Attorney
St. Landry Parish
Jennifer M. Ardoin, Asst. District Attorney
P.O. Drawer 1968
Opelousas, LA  70571
(337) 948-0551
Attorney for Appellee
State of Louisiana


Daniel J. Stanford
812 Johnston Street
Lafayette, LA  70501
(337) 232-2272
Attorney for Appellant, William King, III

**Cooks, Judge**
## FACTS AND PROCEDURAL HISTORY

Defendant, William King, III, (Defendant) was indicted on January 26, 2010, for the brutal second degree murder of Brian Armstrong (Armstrong), in violation of La.R.S. 14:30.1. The murder took place in the St. Landry Parish jail in cell number eight known as "the drunk tank." Defendant's cousin, and co-perpetrator, Chadwick O. King (Chadwick) was also indicted for the murder.[1]

The jury found Defendant guilty as charged on March 15, 2012. Chadwick's jury rendered a responsive verdict of guilty of negligent homicide in a separate trial in late March of 2012, after Defendant's trial.[2] Defendant filed a motion for new trial arguing the evidence did not support the essential elements of his conviction and further asserted that newly discovered evidence would have changed the verdict. The trial court denied Defendant's motion on January 23, 2013.

Defendant appeals his conviction, arguing the evidence was insufficient to convict him or to show his specific intent to cause death or great bodily harm to Armstrong. He also asserts the testimony of a key witness, Reginald Cretain (Cretain), was unreliable because of mental impairment.

Included as an attachment to Defendant's brief is a transcript of Cretain's testimony from Chadwick's trial, given on March 30, 2012, after Defendant's trial. It is not a part of the record of Defendant's appeal. Nothing indicates it was ever shown to or discussed with the trial court as part of this matter. Defendant's motion for new trial alleges he tried to obtain a transcript of the testimony, but the

---

[1]Although in Defendant's appellate brief he states he is not related to Chadwick King, the trial court's Reasons for Judgment (denying Defendant's motion for new trial) indicate Defendant and Chadwick are cousins.

[2]William King is referred to throughout this opinion as "Defendant" and Chadwick King is referred to as "Chadwick."

cost was prohibitive. Nevertheless, Defendant obtained this testimony and now seeks to offer it as part of this appeal. This court may not consider this transcript which has not been first presented to the trial court. Uniform Rules—Courts of Appeal, Rule 2-1.7. *See also Denoux v. Vessel Mgmt. Servs., Inc.*, 07-2143 (La.5/21/08), 983 So.2d 84. For the reasons as stated herein we affirm Defendant's conviction.

## FACTS

Brian Armstrong was kicked and stomped to death in the Opelousas City Jail on September 28, 2009, by Defendant and Chadwick. Armstrong was booked into the jail around 8:39 p.m. on September 27, 2009, for disturbing the peace due to intoxication, resisting an officer, and entering/remaining on premises after being forbidden. He was attempting to attend an Alcoholics Anonymous meeting in Opelousas, Louisiana. The toxicology report and expert medical testimony demonstrate Armstrong was severely intoxicated and had also consumed a large quantity of the drug Prozac. The booking sheet indicates Armstrong "was very combative and was not dressed out." According to trial testimony, Armstrong was "combative" in that he would not comply with the arresting officers' requests and became limp when the officers at the jail attempted to put him in the "drunk tank."

The video recording system at the jail included a camera at the end of a hallway that showed the exterior of cell eight. The camera was motion-activated. Without movement the camera is operational but does not record. According to the State's witness, "the cameras were not working . . . [n]ot showing on the monitor" at the patrol supervisor's desk on September 27, 2009. Thus, the patrol supervisor, Lieutenant Mark Semien (Lieutenant Semien) of the Opelousas Police

2

Department, could not observe anything that took place in the hallway outside cell eight.

The recorded video shows Armstrong was unable to stand when he was carried out of the booking area at 8:18 p.m. on September 27. Lieutenant Semien testified Armstrong "just went limp and he refused to get up" when "he learned that he was going to the jail cell." Law enforcement officers carried Armstrong into the "drunk tank," an eight-foot by eight-foot cinderblock room. The light in the cell did not work; a light was in the hallway, but "you can only see, you know, very – very little in the – in the drunk tank." Nevertheless, Lieutenant Semien testified he could clearly see Armstrong inside the cell because he "was lying right there at the doorway when you open the doorway." The cell's solid metal door had a small rectangular window around eye level and a pan-slot lower on the door. It was through this pan-slot that a jail trustee saw Armstrong lying dead on the bloodied floor of the cell the next morning. Apparently no officer checked on the cell for at least six hours.

At 10:40 p.m., the video shows police escorting Cretain through the hallway into the cell.[3] A man wearing an orange jumpsuit is locked in the cell at 11:24 p.m. Another man wearing orange is locked in the cell at 11:32 p.m. At 11:36, the video shows clothing being thrown through the rectangular opening of the cell door into the hallway. Police are in the hallway at 11:55 p.m. on September 27 and again at 12:01 a.m. on September 28, but they do not approach the "drunk tank." An orange jumpsuit is thrown through the opening at 12:31 a.m. Nothing else occurs on the video until 6:00 a.m., when an officer appears in the hallway. He does not check the cell. At 6:05 a.m., a jail trustee, picking up trash in the hallway,

---

[3]Cretain testified he was wearing plaid shorts and white and turquoise shoes, as shown on the video.

3

puts something into the pan-slot of the door, and at 6:07 a.m., he puts the orange jumpsuit through the opening. At 6:08 a.m., he looks through the opening in the doorway and summons help. Medical personnel arrive at 6:23 a.m.

Lieutenant Semien identified Cretain and Chadwick at trial. He testified no one was in the "drunk tank" cell when Armstrong was placed inside. Armstrong was conscious when he was brought to the police station and when they placed Cretain into the cell with him. When the victim was placed in the cell, he was alive, fully clothed, and had no signs of any of the injuries he later suffered and died from. He was left lying on the floor on his stomach. Every time Lieutenant Semien opened the cell door, Armstrong looked up and moved, indicating to the Lieutenant he was conscious and alive. Lieutenant Semien did not consider Armstrong "that much impaired that he needed medical attention" upon arrival at the station "because he was being combative with the officers."

Armstrong made no sound at any time Lieutenant Semien went to the cell. He discovered Armstrong was dead when other officers reported to him. Lieutenant Semien could not say what time Armstrong died or how long he had been dead when the body was discovered. He believed he would have heard any "excessively loud" noises coming from the drunk tank "if they were banging on the door, stuff like that," while he was at his desk. A solid steel door separated the desk from the hall that led to the "drunk tank." Cretain testified he screamed for help and banged on the cell door repeatedly while Armstrong was being brutally stomped to death by Defendant and Chadwick but no one came to help.

Jeffery Fuselier, the trustee at the jail, testified one of the men inside the cell asked Fuselier to hand him a shirt. Fuselier handed him the orange shirt thrown from the cell earlier. Another man in the cell asked Fuselier to hand him the orange jumpsuit thrown from the cell onto the floor in the hallway. Fuselier gave

4

them the clothing through the pan-slot in the door. He counted three people in the cell, and then saw the body on the floor, lying on its back. A shirt found near the body was torn into two pieces.

Cretain, who was living in Tacoma, Washington at the time of trial, was an eyewitness to the murder. He thought he was placed in the Opelousas City Jail for "disturbing the peace or something – something close to that."[4] He testified Armstrong was on the ground when he went to the holding cell. Armstrong "was sleeping, you know, drunk and stuff . . . He was laying like on his stomach . . . arms to his side, you know, and kind of like sleeping there[.]" Cretain testified he saw no injuries on Armstrong's body when he first observed him. Armstrong was "a little bit" conscious, and he lifted his head, looked at Cretain, and then "laid back down."

Cretain identified Defendant as the next person brought to the cell although booking records indicate Defendant went to the cell after Chadwick. Defendant "was a little upset and stuff," and "he was talking and . . . voice was kind of . . . like angry and stuff, you know, just cursing a little bit and stuff, you know." He was wearing an orange jumpsuit. Cretain was intoxicated and "kind of like upset" himself. Cretain testified that after all four men were in the cell, Defendant kicked Armstrong twice in the head while he was lying on the floor, then Chadwick joined in the beating. Both Defendant and Chadwick "jumped on him." Chadwick began striking Armstrong after about "the first three blows" from Defendant. Both kicked Armstrong in the face, and then, Chadwick kicked him in the side. Defendant removed Armstrong's clothing and then "stomped in the groin section" causing severe injury to Armstrong's genitals and inner thighs.

---

[4]The jail's booking log indicates Cretain's charge was aggravated assault.

As Defendant stomped Armstrong in the groin, he said "'[y]ou ain't gonna have no more kids,' or something like that," and referred to Armstrong as "You Cracker." Chadwick stood on the cell's bench and jumped onto Armstrong again. The body, according to Cretain, was "bloody, bruised, busted up on the face, uh, just – groin area, man, was just, I mean – I mean, demolished. I mean, stuff just like just, I mean just pushed – pushed in." Forensic evidence showed that Armstrong suffered severe internal injuries, including lacerations to his liver and a torn mesentery, which holds a person's intestines in place.

Cretain banged on the cell door and called to his brother, Devon Cretain (Devon), who was in another area of the jail. He believed Devon and "other guys up in there" heard him. Defendant and Chadwick stopped "for a minute and then they went back and then after that, they just left him – just left him alone after that . . . He wasn't breathing or nothing no more and stuff." Cretain could tell Armstrong was not breathing by the way the body lay. Armstrong had turned onto his back while they kicked him hard in the face, and "[h]is whole side was split." Cretain missed some of the beating because his back was turned when he was banging on the door, but he could hear "like stomping . . . like the kicking and stuff." Although Cretain did nothing to try to intervene, he felt he tried to help Armstrong by banging on the door in hopes of getting someone to help.

In the video of Defendant's post-incident interview, he told law enforcement officers he "didn't kill that dude on purpose." Defendant did not recall very much of what happened because he was "f_ _ _ _d up." He did recall that he kicked Armstrong twice in the jaw while Armstrong lay on the floor and that Chadwick had kicked Armstrong also. Defendant actually commented in his statement, "nobody's perfect."

The trial court accepted Dr. Joel Carney (Dr. Carney) as an expert in forensic pathology. Dr. Carney performed an autopsy on Armstrong on September 29, 2009. Pre-autopsy photographs showed Armstrong had "a number of blunt injuries," including contusions (bruises), abrasions (scrapes), and patterned contusions. Dr. Carney explained "blunt injuries" are produced by blunt objects, including fists and feet. He saw no defensive injuries to Armstrong's hands. He testified that all of the bruising on Armstrong's face, genitals, and torso occurred while he was still alive. When asked if there is a way to tell whether someone received a laceration before or after death, Dr. Carney explained:

> Injuries that occur prior to death result in bleeding and this is due to the presence of blood pressure during life. In other words, during life the heart is beating. The blood vessels are filled with blood under pressure. When these blood vessels are injured, they allow blood to leak into the surrounding tissues and this produces visible discoloration of the injured site.

> Injuries that take place after death, in contrast, are usually lacking in color. That is, they're usually yellow in color because these injuries don't have any bleeding involved with them so – so, yes, there is a way we can distinguish them.

After the body was washed, Dr. Carney found abrasions on the back of Armstrong's head. He found a patterned contusion of seven roughly parallel lines on the front of Armstrong's right shoulder. Another patterned contusion of seven parallel lines was located on Armstrong's left flank, "the left thoraco-abdominal skin," and the right flank also had "a number of contusions and abrasions." The back of Armstrong's right elbow also had contusions and abrasions. Armstrong's ear had a tear near the left ear canal, and his face had a "large contusion which was red-purple in color and this contusion actually involved the entirety of the face," from the forehead to the neck. Armstrong had a tear at the corner of his eye, a laceration on the upper portion of his chin, extensive bruising involving the internal aspect of the upper lip, multiple lacerations that tore the inner lining of the

7

mouth and extended to the back of the mouth, and a laceration "within the distribution of the mustache." The bottom lip was cut and bruised, and Armstrong had another cut just below the nostril.

Armstrong's left eye showed bruising of the eyelids and "a laceration at the angle of the eye." A patterned contusion was on the skin of the forehead. Several superimposed lacerations were on the nose. Armstrong's neck contained a red bruise with a superimposed darker red bruise. Bruises and contusions involving the right lower portion of the abdomen "extended onto the genitalia, including the dorsal aspect, the top of the penis." Both of Armstrong's testes were bruised. The bruises "also involved the right side of the scrotum" and extended onto the inside of Armstrong's thighs. The right side of the abdomen contained another patterned contusion of wavy lines. The right groin showed the patterned contusion of parallel lines.

Dr. Carney's internal examination during the autopsy showed fractures of Armstrong's face, including fractures of the right orbital rim, "a bone immediately beneath the right eye," and the right zygomatic bone, "the bone located immediately beneath the skin at this location." In the upper portion of the neck, the hyoid bone was fractured, indicating "that blunt force or compression occurred to the front of the neck."

The thyroid cartilage (Adam's Apple) was fractured. Dr. Carney explained that cartilage is normally "rigid so as to maintain patency of the airway so that air can pass through it." Armstrong's fracture "extended through the entire length of the thyroid cartilage[,]" indicating "that a blunt force was applied to the front of the neck in the form of a blow or compression."

Armstrong had multiple rib fractures on both the right and left sides. Some of "the edges of the fractured bones were separated from one another and they

8

were projecting into the right lung cavity." Liquid blood was present within the abdominal cavity. The capsulary surfaces of the liver and spleen were torn. The mesentery, "a structure that anchors the intestine," contained a large laceration, "twelve by seven inches . . . capable of producing significant bleeding."

Dr. Carney "ascribed the cause of death as blunt injuries[,] and an element of neck compression [was] not entirely excluded." Loss of blood was also a cause of death. Dr. Carney could not exclude neck compression because of the fractured hyoid bone and the fractured thyroid cartilage. Those fractures could have caused lack of oxygen or "stimulation from a small organ in the neck known as the cardioid body which is capable of actually stopping the heart." Dr. Carney could not determine "what mechanism of injury actually caused the death but – but the cause of death [was] blunt injuries." He did not find any of the blunt force trauma to Armstrong's head to be life-threatening. Armstrong's blood alcohol level at the time of the autopsy, around 3:00 p.m. on September 29, 2009, was .352 percent, a level "capable of producing unconsciousness" but not death.

Armstrong also had "two thousand, seven hundred and eighty two nanograms per mil" of the drug Prozac in his system, about five times the upper limit of therapeutic level. The combination of Armstrong's levels of alcohol and Prozac could cause death but Dr. Carney did not believe these to be the cause of Armstrong's death.

While Dr. Carney did not issue the death certificate, he provided the opinion as to the cause and manner of death. His opinion was "blunt force trauma caused the death." Armstrong's death certificate, however, indicated causes of death as "Blunt Injuries (multiple over body) due to inflicted trauma" and "Alcohol Intoxication (0.352%)." Dr. Carney surmised the local coroner added alcohol intoxication as an additional cause of death. Dr. Carney testified his analysis about

9

damage to Armstrong's neck "came up after the fact," but he did not issue a supplemental autopsy report. He believed alcohol may have contributed to Armstrong's death, but "he had fatal injuries. Fatal injuries trump the toxicology. The injuries were hemorrhagic and they were incurred during life[.]"

The trial court accepted Bethany Harris of the Acadiana Crime Lab "as an expert in forensic science with a specialist as a DNA analyst." Ms. Harris prepared DNA profiles of Defendant, Chadwick, and Armstrong from reference DNA samples. She performed DNA analysis on a blood stain from the orange prison jumpsuit recovered from Defendant that showed the DNA of major and minor contributors. Armstrong was the major contributor. Ms. Harris first testified neither Defendant nor Chadwick could be excluded as potential contributors to the minor DNA profile found on the jumpsuit. However, she later said Chadwick was "excluded as the source of that minor profile," but she could not exclude Defendant.

Ms. Harris also analyzed a pair of Nike brand athletic shoes containing a single source DNA profile; the profile matched Armstrong. The shoes were seized from Defendant at 9:20 a.m. on September 28, 2009, at the Opelousas Police Department. The DNA was extracted from a blood stain on the shoes.

The orange prison jumpsuit collected from Chadwick also contained a spot of blood. The DNA profile showed Armstrong was the major DNA contributor. Of the two minor contributors, Chadwick could not be excluded as part of the mixed profile. Ms. Harris could not determine the identity of the second minor DNA contributor to the mixed profile, but she excluded Defendant.

Chadwick's Timberland shoes also contained blood. The major contributor of the DNA in that blood was Armstrong; Chadwick was the minor contributor.

10

Mark Kurowski (Mr. Kurowski) qualified "as an expert in forensic science and with the speciality [sic] or emphasis on shoe print analysis." He enlarged photographs provided by the St. Landry Sheriff's Office to life size "and then made test impressions using the shoes and then overlayed those impressions on the photographs." Mr. Kurowski explained Defendant's Nike Air Force One shoes had a unique sole pattern of two areas of concentric circles, "parallel lines around the perimeter, and a small star pattern at the top." Using impressions of those shoes and scale photographs of Armstrong's body, Mr. Kurowski determined the shoes inflicted injuries shown to Armstrong's right neck area and forehead. The imprints on three other areas of injury were "more similar to the Timberland brand shoes" belonging to Chadwick. Although Armstrong also wore Nike Air Force One shoes, Mr. Kurowski excluded those shoes from causing any of the injuries based on their size. The larger size thirteen shoes of Armstrong would have made "parallel lines much fa[r]ther apart[.]"

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

**ASSIGNMENTS OF ERROR NOS. 1 and 2.**

Defendant argues the evidence was insufficient to prove beyond a reasonable doubt that he committed second degree murder and that he possessed the specific intent to kill or do great bodily harm to Armstrong. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170,

*cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, (La.App. 3 Cir. 9/30/98), 720 So.2d 724. Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

Second degree murder under these facts "is the killing of a human being . . . [w]hen the offender has a specific intent to kill or inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). "Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant." *State v. Maxie*, 93-2158, p. 11 (La. 4/10/95), 653 So.2d 526, 532 (citing *State v. Graham,* 420 So.2d 1126 (La.1982)). "The severity of a victim's injuries may be probative in proving the defendant's intent to kill." *State v. George*, 09-143, p. 8 (La.App. 3 Cir. 10/7/09), 19 So.3d 614, 620 (citing *State v. Green,* 484 So.2d 698 (La.App. 1 Cir. 1985), *aff'd*, 493 So.2d 1178 (La.1986)).

In *State v. Jones*, 09-1453 (La.App. 3 Cir. 8/11/10), 45 So.3d 1136, *writs denied*, 10-504, 10-2132 (La. 2/18/11), 57 So.3d 328, 330, the defendant beat, anally raped, and stabbed his girlfriend over a period of three days. On appeal, he argued he did not intend to kill his victim, evidenced by the small size of the stab wound and the fact he did not aim at or hit a vital organ. He claimed the opening in the chest wall and collapsed lung were accidental. The defendant refused to let his victim seek medical help because he feared being implicated, but he treated her wound by securing a wash rag to her chest with duct tape. She finally escaped with the help of a neighbor. He was convicted of attempted second degree murder and a panel of this court upheld that conviction. The victim's treating physician testified the chest wound "was both significant and life-threatening." *Id.* at 1139. She had very low blood pressure, was going into shock, and required a blood transfusion upon arrival at the hospital. She also had a collapsed lung and required surgery to remove clotted blood in her chest cavity. Her physician testified she would have died had she not received treatment when she did. This court rejected

13

the defendant's argument that he had no specific intent to kill or cause great bodily harm.

In *State v. Scott*, 09-748 (La.App. 3 Cir. 12/9/09), 26 So.3d 313, *writ denied,* 10-94 (La. 6/25/10), 38 So.3d 336, the defendant was convicted of second degree murder after he struck the victim multiple times with a baseball bat. As the victim exited the side door of a lounge, the defendant struck him once in the head, then hit him two more times. A witness testified she had seen the defendant "running with a bat hitting people." *Id.* at 315-16. The defendant argued the chaos in the area precluded a finding of what truly transpired. He contended others also hit and kicked the victim.

Dr. Carney performed the autopsy on the victim in *Scott* as he did here. He testified at trial "the cause of death was injuries to the head and brain which were the result of blunt force trauma consistent with being struck forcefully in the head with a bat." *Id.* at 316. This court held specific intent to cause great bodily harm could be inferred from the defendant's act and affirmed his conviction.

Here, Defendant admittedly kicked the helpless victim twice in the jaw, apparently without any provocation. He stomped Armstrong's neck area and forehead so hard he left an imprint of his shoe in Armstrong's skin. He fractured Armstrong's hyoid bone and thyroid cartilage. Dr. Carney testified those injuries could have caused neck compression and led to Armstrong's death. Defendant also stomped Armstrong's groin area and "demolished" Armstrong's groin area while declaring Armstrong would never have any kids. Armstrong's blood and DNA were on Defendant's shoes. The jury could reasonably conclude that Defendant at the very least intended to inflict great bodily harm on Armstrong.

Defendant suggests he should not be held responsible for this death because Armstrong would have died anyway from excessive consumption of Prozac and

alcohol. This argument, disrespectful of a human life as it is, ignores the fact that *Armstrong was alive at the time Defendant and Chadwick attacked him.* Dr. Carney testified the body would not have bruised and bled as it did had Armstrong already been dead at the time Defendant and Chadwick brutally kicked and stomped him. As Dr. Carney testified, "[f]atal injuries trump the toxicology."

One does not kick or stomp a victim with enough force to fracture his neck area or demolish his groin area without the specific intent to at least inflict great bodily harm, if not to actually kill. Both the nature and the extent of the injuries infer the specific intent to kill or cause great bodily harm. Thus, the evidence was sufficient to establish Defendant's specific intent and his guilt. Defendant's arguments lack merit.

**ASSIGNMENT OF ERROR NO. 3.**

Defendant contends Cretain's testimony was unreliable because his ability to perceive events was impaired by a head injury. He argues Cretain's testimony about this incident "changed and evolved" from the time of his law enforcement interview on the day of the incident to when he testified at Chadwick's trial on March 30, 2012.

The jury assessed Cretain's credibility and weighed the evidence and we will not disturb its determinations of credibility. *Ryan*, 969 So.2d 1268. Further, the evidence was sufficient to convict Defendant even without considering Cretain's testimony. Armstrong was alive when Defendant was placed in the cell, and he was dead some six hours later. He was brutally injured. Defendant admitted to kicking Armstrong. Defendant had Armstrong's blood and DNA on his shoes. Defendant's shoe prints were on Armstrong's neck and forehead.

Additionally, much of Defendant's argument involves Cretain's testimony from his civil deposition and his testimony at Chadwick's trial. Thus, his argument

15

depends on evidence that was not presented in the trial court and may not be considered here. Uniform Rules—Courts of Appeal, Rule 2-1.7. We find Defendant's argument lacks merit.

For the reasons as stated above we affirm Defendant's conviction.

**AFFIRMED.**