STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-1211

STATE OF LOUISIANA

VERSUS

DANIEL JOSEPH HARMON

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR110695
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.

AFFIRMED.

**Michael Harson**
**District Attorney**
**Fifteenth Judicial District**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Daniel Joseph Harmon**

**Daniel Joseph Harmon**
**Louisiana State Penitentiary**
**Hickory 4**
**Angola, LA 70712**
**PRO SE**

**PETERS, J.**

The defendant, Daniel Joseph Harmon, appeals his conviction of second degree murder, a violation of La.R.S. 14:30.1. For the following reasons, we affirm the defendant's conviction in all respects.

## DISCUSSION OF THE RECORD

This criminal appeal has as its origins the July 25, 1989 tragic murder of Christina Marie Wood.[1] At the time of her death, Ms. Wood was living in an upstairs apartment, Apartment D of the Marigny Circle apartment complex in Duson, Louisiana. She shared the apartment with her boyfriend, Gary Cheramie, an offshore worker in the oil and gas industry. Her charred body was found in their apartment at approximately 9:00 a.m. on the morning of July 25, 1989, by a maintenance man sent to investigate a report of a fire. Her throat had been slit, she had been shot in the head three times, and her body set ablaze. Additionally, a double-stranded ligature with an adjustable loop made from a shoelace hung loosely around her neck. Ms. Wood had recently been involved in sexual activity, although one of the disputes at trial revolved around whether or not the activity had been consensual.

The initial investigation by the Lafayette Parish Sheriff's Department (LPSD) produced no suspects, and the case remained cold until 2003. In that year, the activities of a serial killer in southwest Louisiana prompted the Louisiana Legislature to fund the review of unsolved sex offenses, and these funds allowed the Acadiana Crime Lab (Crime Lab) to reopen this case. The subsequent investigation resulted in a Lafayette Parish Grand Jury returning an indictment on May 16, 2006, charging the defendant with the first degree murder of Ms. Wood, a violation of La.R.S. 14:30. The State of Louisiana (state) later amended the bill of

---

[1] Ms. Wood would have been twenty years of age had she lived to her December 17, 1989 birthday.

indictment to reduce the charge to second degree murder, a violation of La.R.S. 14:30.1. Trial began on April 23, 2013, and on April 30, 2013, the jury returned its verdict convicting the defendant of the amended charge. On May 30, 2013, the trial court sentenced the defendant to serve life imprisonment at hard labor with the sentence to be served without the benefit of probation, parole, or suspension of sentence. After the trial court denied the defendant's motion for a new trial, he perfected this appeal, asserting seven assignments of error:

1. The evidence adduced at trial was insufficient to support a conviction for second-degree murder.

2. The trial court erred in replacing Juror Spears with an alternate juror.

3. The trial court erred in allowing the State to refer to other crimes evidence by continually mentioning that [the defendant's] name was in the CODIS system.

4. The trial court erred in failing to grant [the defendant's] Motion for New Trial.

5. The trial court erred in allowing the coroner's report to be introduced at trial when the coroner was unavailable.

6. The trial court erred in not allowing [the defendant] the opportunity to present an alternate theory of defense.

7. The trial court erred in allowing [the defendant] to be convicted by less than [a] unanimous verdict.

***Summary of the Evidence Presented by the State of Louisiana***

At approximately 4:30 a.m. on July 25, 1989, Ms. Wood telephoned Barry Paul Roger and told him that when she returned home she found that the door knob on her apartment "had been messed with" and that things in the apartment were out of place, having been "moved around."[2] She also told Mr. Roger that she had been

---

[2] Mr. Roger testified that at the time he worked for Caldwell Technology, and had met Ms. Wood through Gary Cheramie a few times. However, nothing in the record explains why she telephoned Mr. Roger on the morning of her murder other than to reaffirm that Mr. Cheramie was offshore at the time.

2

with friends at a place on Verot School Road and had come home to the abnormal findings.[3] That same morning Ms. Wood telephoned Gary Cheramie's father Tillman Cheramie, III and told him the same thing she had told Mr. Roger and asked him if perhaps his son had come in from offshore.

Joseph Brown, the maintenance man at the apartment complex, responded to a call he received that morning telling him that smoke was coming from one of the apartments and was the first to arrive at the apartment. Initially, he could not enter the apartment because of the thick smoke, but when he broke a bedroom window from the outside, much of the smoke vented to the outside and, using his master key, he entered and found Ms. Wood lying on the bedroom floor. He immediately left the apartment, but in doing so, noted no damage to the door or broken windows other than the window he broke.

The call to the Lafayette Fire Department came in at 8:35 a.m., and the first firemen arrived on the scene at 8:47 a.m. Approximately one hour later, Fire Investigator Robert Benoit[4] arrived at the scene. Ms. Wood's body had yet to be moved from the bedroom, and he observed that the upper portion of her face-down nude body had been covered by loose clothing and the clothing set on fire. Other clothing was scattered around the room, and the smoke alarm had been pulled off the wall. Mr. Benoit noted that bath towels were wrapped around Ms. Wood and stacked under her head; and one hand clenched the towels under her body. He also observed the double-stranded ligature tied loosely around Ms. Wood's neck, a "large slash wound" to her throat, and three gunshot wounds to her head. According to Mr. Benoit, the fire was at its infant stage when Mr. Brown broke the

_____

[3] At approximately 8:30 a.m., LPSD deputies appeared at Mr. Roger's office inquiring of the whereabouts of Gary Cheramie. Mr. Roger contacted the offshore rig and confirmed Mr. Cheramie's presence on the rig.

[4] At the time of trial, Mr. Benoit was the Fire Chief of the Lafayette Fire Department.

window from the outside, and the fresh air accelerated the flames throughout the apartment. Given his observations and findings, Mr. Benoit concluded that the fire had been intentionally set using an accelerant spread around the room and on Ms. Wood's body.[5] However, he found no evidence of forced entry into the apartment.

LPSD Detective Sherry Feister participated in the initial investigation on the morning of July 25, 1989, and also found no evidence of forced entry.[6] She recovered and/or supervised the recovery of nine latent fingerprints taken from Mr. Cheramie's vehicle, nine from an empty vegetable oil bottle, two from the broken window, and one from the deadbolt lock. A 1989 analysis of this evidence by the Automated Fingerprint Identification System (AFIS) resulted in no matches to any fingerprints on file in that system.

On July 27, 1989, the Crime Lab received a sexual assault kit containing physical evidence taken from Ms. Wood's body. Howard Joseph Verret, Jr., a forensic chemist with the Crime Lab, examined both a vaginal smear slide and a rectal smear slide he obtained from the kit. With regard to the vaginal smear slide, he "found a couple of spermatozoa," and, with regard to the rectal smear slide, he found "three spermatozoa heads." He also examined a number of clothing items recovered at the crime scene and found that the stains on those items were attributable to Ms. Wood as donor.

Further evaluation of the evidence failed to materialize until August 25, 2003, when another forensic chemist with the Crime Lab forwarded the sexual assault kit for DNA testing to Orchid Cellmark Lab (Orchid Lab) in Nashville,

---

[5] Although Chief Benoit testified that he collected six samples from the area of the accelerant, and that an empty cooling oil bottle was found in the apartment, nothing in the record identifies the particular accelerant used to burn the apartment and Ms. Wood's body.

[6] She did observe a bloody broken pane of glass to the right of the apartment door, but concluded that it had been broken from the inside of the apartment.

Tennessee. Dr. Debra Cutter, a forensic testing expert at Orchid Lab, performed the laboratory analysis requested and concluded that the two rectal swabs contained both male and female DNA; and that the female sample matched Ms. Wood's DNA as would have been expected. However, because Dr. Cutter had no reference DNA sample to compare to the male DNA on the rectal swab, she could not match that sample to anyone. Orchid Lab forwarded a report of its findings to the Crime Lab on September 30, 2003.

On January 4, 2006, Carolyn Booker, a Crime Lab forensic DNA analyst, caused the Orchid Lab male DNA test results to be entered into the Combined DNA Index System (CODIS), a national DNA database, for comparison with samples on file. The CODIS search matched the male contributor of the DNA found on the rectal swab to the defendant's DNA sample in its data base. As a follow-up to this identification, Ms. Booker sought and obtained blood samples from the defendant and four other individuals[7] for testing. After completing her additional testing, Ms. Booker excluded the other four individuals and concluded that "within scientific certainty, the [defendant] is the source of the male profile on the semen on the vaginal and rectal swabs from the victim."

In early 2006, and with the DNA connection in hand, LPSD Detective Jean St. Pierre took over the investigation. Upon reviewing the investigative record available to him, he discovered that the defendant had been living in the apartment building next to Ms. Wood on July 25, 1989.[8] When he ran the license plates of

---

[7] Ms. Booker's report entered into evidence identifies these four other individuals as Samir Moh's Tobeh Alais, Pat Costello, Michael Guidry, and Chad Leger.

[8] On the morning of July 25, 1989, the defendant had been sharing a downstairs apartment with Paulette Mire in the building adjacent to Ms. Wood's apartment. The utility records establish that utilities were connected on January 3, 1989, and disconnected on August 16, 1989. LPSD Detective Allen Venable interviewed Paulette Mire in 1989, and was told that

5

vehicles observed at the scene that morning, he discovered that one of the vehicles was registered to the defendant's grandfather. Further investigation revealed that in 1994, the defendant had been convicted in Tennessee of a sex offense and that this conviction required that he register in Louisiana as a sex offender.

On March 16, 2006, officers of the LPSD arrested the defendant for his failure to register as a sex offender. After being taken into custody, Detective St. Pierre and other officers questioned the defendant, and the video of that interrogation was played to the jury. Initially, two officers, not including Detective St. Pierre, questioned the defendant concerning his failure to register as a sex offender, and in response to this line of questioning, the defendant stated that he had been convicted of simple rape of Paulette Mire in 1994, while the couple was living in Nashville, Tennessee; and that he had been incarcerated for that offense until 2000. Although his incarceration was for the rape of Ms. Mire, the defendant told the investigating officers that when he was released from prison, Ms. Mire picked him up and they returned to Louisiana together. In fact, at the time of his arrest, the defendant was still living with Ms. Mire. The Tennessee conviction gave rise to the defendant's DNA being entered into CODIS.

At this time, the two deputies left the interrogation room, and Detective St. Pierre and another officer came in to turn the questioning to the events of July 25, 1989. The defendant acknowledged that at that time he had been residing with Ms. Mire in a ground floor apartment in the Marigny Circle apartment complex, and he recalled a fire in the building next door. However, he denied any knowledge of a homicide being connected to the fire, and he stated that Ms. Mire never discussed the event with him. When shown a picture of Ms. Wood, he stated that he did not

___

she was out of town on the morning of the homicide. However, no one with the LPSD interviewed the defendant in 1989.

6

recall seeing her around the apartment complex. However, when confronted with the DNA evidence matching his DNA to that found in the vaginal and rectal swabs, he stated, "If my DNA matches it would have to be me."

At the end of the March 30, 2006 interrogation, Detective St. Pierre placed the defendant under arrest for first degree murder. During the booking process, the defendant's fingerprints were taken, but these prints were never compared with those recovered from Ms. Wood's apartment. Detective St. Pierre stated that the comparison was not made because when he requested access to the prints recovered on July 25, 1989, he was informed by the custodian of those prints that there were none of value that could be used for comparison.

### Summary of the Evidence Presented by the Defendant

Dr. Ronald Acton, a forensic DNA expert from Montgomery, Alabama, testified for the defendant, and while agreeing with Ms. Booker's findings that the rectal swabs contained a DNA mixture contributed by two individuals, he suggested that any conclusion that the defendant was the male contributor, had to be based on an assumption that the sample was collected, preserved, and tested correctly and that the evidence was not mingled — an assumption that he did not accept. He also questioned the population profile used by Ms. Booker and suggested that it failed to meet scientific scrutiny. Ms. Booker had testified that the profile acquired from the scientific testing generates a number indicating the rarity of the profile in the population and that the number generated in her testing indicated that it was more rare than one in 300 billion people (more than enough to satisfy the "scientific certainty" standard). However, Dr. Acton suggested that the number was based on a random population and not Louisiana's unique population. According to Dr. Acton, the supposed profile was not based on a test of an

7

individual's 50,000 genes, but rather on sixteen out of a possible 40,000 genes. In his opinion, the DNA profile in this case provided no information on the context or the circumstances under which the DNA was discovered and, therefore, was unreliable.

Donald Bearb, Jr. was a tug boat captain when he testified at trial, but was a twenty-one-year-old car salesman living in the Marigny Circle apartment complex in 1989. He testified that he met Ms. Wood in the washateria area of the complex two weeks before July 25, 1989, struck up a friendship, and dated her on or near the date of the homicide. According to Mr. Bearb, on the night of his date with Ms. Wood, he picked her up before dark and they spent the next few hours together at a commercial establishment called the Bull's Eye, where they drank, talked, and threw darts. They returned to Ms. Wood's apartment sometime between 10:00 and 11:00 p.m., where they engaged in consensual unprotected sex.[9] Mr. Bearb testified that he left Ms. Wood at her apartment at 1:00 a.m.

Mr. Bearb became aware of the fire when a friend telephoned him at work on July 25, 1989, and informed him that fire trucks were in the apartment complex. Additionally, he was questioned by LPSD officers during the initial phase of the investigation. He informed the officers that he had dated Ms. Wood, but could not be specific concerning the particular time. That is to say, he could not remember whether the date had occurred the night before the fire, or the Friday before that.[10] At trial, his memory remained inconsistent concerning the calendar date of his time spent with the victim. In his testimony, Mr. Bearb suggested that the date probably occurred the day before the homicide, but he was not sure. While he shared the

---

[9] Mr. Bearb testified specifically that he did not use a condom.

[10] July 25, 1989, was a Tuesday.

evening with Ms. Wood and engaged in sexual intercourse with her, he did not know her last name and was not sure whether her first name was Christine or Christina. The LPSD never requested a DNA sample from him, and he never provided a sample to anyone.

Another resident of the neighborhood in 1989, Tasha Stafford, testified that she recalled the fire trucks on July 25, 1989, but initially knew nothing of what had occurred that morning. In July of 1989, she was fourteen years of age and living with her mother in Jackson Square.[11] Despite her very young age, she was also involved in an intimate relationship with Michael Dickerson, a nineteen-year-old resident of a nearby apartment. Ms. Stafford testified that she would often visit Mr. Dickerson at his apartment and not return home for two or three days. Despite her mother's efforts to prevent the relationship, it continued to flourish for a few months after the events of July 25, 1989, and she testified that it was at one of these visits that he shared with her some information concerning Ms. Wood's murder.

According to Ms. Stafford, one morning in November of 1989, she skipped school to spend the day with Mr. Dickerson, and when she approached his apartment, she observed Maria Turner leaving the apartment in tears. She questioned Mr. Dickerson concerning what she saw, and he informed her that Ms. Turner was having problems with her boyfriend.[12] During the rest of the day, Ms. Stafford and Mr. Dickerson engaged in sexual activities and consumed narcotics together, and toward the end of the day, Mr. Dickerson told her he had something to tell her that she must keep secret. Mr. Dickerson then informed Ms. Stafford

---

[11] Jackson Square is another apartment complex immediately adjacent to Marigny Circle.

[12] Mr. Dickerson was later convicted of having raped Maria Turner that day.

9

that he and Michael Guidry had raped, killed, and burned[13] Ms. Wood on the morning of July 25, 1989. He then gave her a pocket knife and told her to dispose of it. Initially, she thought he was teasing and dismissed his confession as "bull----." She did not initially relate this to anyone, and the first time she spoke to law enforcement personnel was in 2006.

Ms. Stafford was not the only individual sexually involved with Mr. Dickerson in 1989. Levonia Leger testified that in 1989 she also lived in Jackson Square and was intimately involved with Mr. Dickerson. According to Ms. Leger, she was frightened on the morning of July 25, 1989, when she heard the news of the fire and homicide, and Mr. Dickerson calmed her fears because he informed her immediately after the event that it was a "mob job." Ms. Leger testified that he knew this because he had friends in the LPSD. Mr. Dickerson was even aware that Ms. Wood had been raped, her throat cut, and that she had been shot. That same morning, Ms. Leger's son Richard told her that he had seen Mr. Dickerson come out of Ms. Wood's apartment. Sometime later that same year, Mr. Dickerson told Ms. Leger that he had committed the rape and murder of Ms. Wood. However, Ms. Leger did not share this information with law enforcement personnel until six or seven years prior to the trial.

Ms. Leger's son Richard Campbell testified that he was eleven or twelve years old in 1989, and that he recalled seeing Mr. Dickerson walking away from the burning building, and saw him stop, smile, and keep walking. When interviewed by Detective St. Pierre years later, he told the detective that this incident occurred between 2:00 and 3:00 a.m., and later he stated simply that when he saw Mr. Dickerson, it was still dark. Additionally, with regard to the fire itself,

---

[13] Ms. Stafford testified that Mr. Dickerson told her that he and Mr. Guidry had burned the victim from the waist down.

Mr. Campbell remembered seeing flames from the building, but he could not say if the flames were coming from the apartment windows or the roof.

At the time of the defendant's trial, Mr. Dickerson was incarcerated in the Concordia Parish Correctional Facility serving a forty-year sentence for the rape of Maria Turner. He acknowledged that in 1989, he lived in close proximity to Marigny Circle and that he was maintaining intimate relationships with both Ms. Stafford and Ms. Leger at the time. When questioned directly about Ms. Wood's rape and murder, Mr. Dickerson denied having any involvement in the offenses, claiming to have arrived at the scene after the fire was in progress. He stated that Michael Guidry told him that he had "slit [the victim's] throat, strangled her, left and thought about it and said, 'She might still be alive,' went back and shot her and then set it on fire." Mr. Guidry told him that the motive for these offenses was the fact that Ms. Wood owed him money for drugs. Other than what Mr. Guidry told him, he had "no idea what happened" on the morning of July 25, 1989, because he was not there. When asked about the details of an August 26, 1993 statement he gave to the police in an attempt to lessen his personal criminal charges, saying that he had information about the victim's murder, he said it was not to get a deal, but to do "the right thing."[14]

The defense then recalled Detective St. Pierre, and he acknowledged that he was the investigating officer in the Maria Turner case. He further testified that he attempted to obtain the knife mentioned by Ms. Stafford to see if it could be connected to Ms. Wood's murder, but ultimately failed because all evidence in that case had already been destroyed.

### Assignment of Error Number One

---

[14] Despite being questioned extensively concerning the content of his prior statement, the statement itself was not introduced into evidence.

In his first assignment of error, the defendant argues that the evidence at trial was insufficient to support his conviction for second degree murder. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review, now legislatively embodied by La.Code Crim.P. art. 821, does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of

the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (third alteration in original).

The factual evidence before us establishes that Ms. Wood died in her apartment on July 25, 1989, sometime after her early morning conversations with Mr. Roger and Mr. Tillman Cheramie and before Mr. Brown arrived on the scene. The factual record also establishes that the defendant resided in a downstairs apartment in the complex on the morning of July 25, 1989, and in close proximity to the time of Ms. Wood's death, he engaged in sexual intercourse with her. The remaining evidentiary issues are either disputed or consist of circumstantial evidence. How circumstantial evidence is to be considered in relation to direct evidence is well-settled.

The characterization of evidence as "direct" or "circumstantial" points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered. If the inference sought is merely that certain facts are true because a witness reported his observation and the assumption is that witnesses are worthy of belief, the evidence is direct. When, however, the evidence is offered also for some further proposition based upon some inference other than merely the inference from assertion to the truth of the fact asserted, then the evidence is circumstantial evidence of this further fact-to-be-inferred. *State v. Graham*, 422 So.2d 123 (La.1982).

*State v. Norman*, 434 So.2d 1291, 1293 (La.App. 3 Cir. 1983).

Furthermore, "[t]he rule as to circumstantial evidence is:  assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  La.R.S. 15:438.

Louisiana Revised Statutes 14:30.1(A)(1), as it applies to this matter, defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]"  Additionally, specific intent to kill may be inferred by the severity of a victim's injuries.  *State v. King*, 13-469 (La.App. 3 Cir. 11/6/13), 124 So.3d 623.  In this matter, Ms. Wood's killer clearly evidenced the intent to kill and inflict great bodily harm: he slit her throat, shot her in the head three times, and set her on fire.  He also used a ligature around her neck for obvious control purposes.

On the other hand, the defendant points to the evidence from his DNA expert and the witnesses who attempted to connect Mr. Dickerson to the offense either as a participant or accessory.  However, it is clear that the jury rejected all of this evidence, and we find no error in that rejection.  "[I]t is the role of the fact-finder to weigh the credibility of a witness . . . . [T]he trier of fact . . . may accept or reject, in whole or in part, the testimony of a witness."  *State v. Authorlee*, 12-1179, p. 10 (La.App. 3 Cir. 4/3/13), 111 So.3d 1170, 1176, *writ denied*, 13-1028 (La. 11/15/13), 125 So.3d 1101.

Applying the *Jackson* standard to the sufficiency issue and viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. We find no merit in this assignment of error.

### Assignment of Error Number Two

In this assignment of error, the defendant asserts that the trial court erred in replacing a juror with an alternate juror four days into the trial. The juror in question, Robert Spears III, was the twelfth juror selected and after selection of alternate jurors, the trial began on Tuesday, April 23, 2013. On Monday, April 9, 2013, Mr. Spears called to say that he was ill and would be unable to come to court. He was instructed to provide medical evidence of his inability to proceed. After informing trial counsel of the complication, the trial court also informed the jury of the reason for the delay in beginning testimony. Mr. Spears then notified the court through the jury pool that he had a 3:00 p.m. doctor's appointment and that he would fax the information concerning his situation as soon as he obtained it.[15] However, he again stated that he was too ill to come in that day. The trial court then removed Mr. Spears as a juror and replaced him with the first alternate, Diane Salts.

At this point, counsel for the defendant informed the court that he had seen the juror in the City at 5:00 p.m. the day before and found it "surprising" that Mr. Spears would complain of being sick the very next day. However, when asked by the trial court for suggestions concerning how else to proceed, counsel had none. The defendant's counsel voiced no further objections and failed to request a mistrial.

It is well settled that a juror's illness may render him unfit or unqualified to serve. *State v. Toussand*, 437 So.2d 989 (La.App. 3 Cir. 1983). Moreover, the replacement of a juror with an alternate juror is within the trial court's discretion. *State v. Tatum*, 09-1004 (La.App. 5 Cir. 5/25/10), 40 So.3d 1082. However,

---

[15] The record contains nothing to suggest any other information was received by the trial court from Mr. Spears after he kept his doctor's appointment or even if he kept the appointment.

because the defendant failed to object to the juror's replacement, he may not raise that objection for the first time on appeal. Uniform Rules—Courts of Appeal, Rule 1.3. Thus, not only does this assignment lack merit, it was not preserved for review.

### *Assignment of Error Number Three*

In this assignment of error, the defendant asserts that the trial court erred in allowing the state to refer to other crimes evidence by continually mentioning that his name is recorded in the CODIS system. We find no merit in this assignment of error because our review of the record reflects that this was never an issue in the presence of the jury.

When Ms. Booker first mentioned CODIS, she started to explain what it stood for and was immediately stopped by the trial court. Out of the presence of the jury, the trial court instructed Ms. Booker to "avoid any suggestion" that CODIS is a data base consisting of a collection of criminal activity. When the jury returned, Ms. Booker described CODIS as "a database of DNA profiles for search against each other." When asked how CODIS was used in this case, Ms. Booker testified that "[t]he DNA profile that was obtained from evidence in the victim's body and in particular the DNA profile that was obtained from the sperm faction from her rectal swab, the DNA profile was entered into CODIS." She then explained that this comparison resulted in a "hit" or "match in the male profile." Ms. Booker testified that she used this information, which consisted of a number unattached to any name, to have the local law enforcement agency obtain a DNA sample from the individual identified by that number for further testing. A DNA profile was taken from the defendant, compared with the sample available to the

Crime Lab, and found to match. The defendant voiced no objection to this line of questioning.

While the defendant now complains that the trial court allowed the state to continually refer to the presence of his name in CODIS, he only objected to the conference discussion and never to anything Ms. Booker stated to the jury. Thus, he failed to preserve any objection to what was told to the jury and cannot raise this issue for the first time on appeal.[16] Uniform Rules—Courts of Appeal, Rule 1-3.

### *Assignment of Error Number Four*

In this assignment of error, the defendant asserts that the trial court erred in rejecting his motion for new trial. Specifically, he asserts that the state misled the jury in closing argument when it read an excerpt from Ms. Booker's report relating to a reference sample of blood taken from Mr. Dickerson.

Louisiana Code of Criminal Procedure Article 851 provides in pertinent part that a new trial shall be granted when:

> (1) The verdict is contrary to the law and the evidence;
> (2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
>
> . . . .
>
> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

The report had been introduced into evidence but had not been shown to the jury prior to closing argument. The report indicated that Ms. Booker had received a reference sample of blood from Mr. Dickerson, but it did not indicate that any

---

[16] Evidence of other crimes was actually presented to the jury by the defendant himself. During the cross examination of Detective St. Pierre, the detective was asked by the defendant's counsel why the defendant had been arrested. Detective St. Pierre responded that he had been arrested for "failure to register as a sex offender and first degree murder."

extraction had been performed on that blood. The report did indicate, however, that Mr. Dickerson had been excluded as a contributor to the DNA profiles obtained from the victim's swabs. When the state argued in closing that Mr. Dickerson had been excluded as a contributor, the defendant objected to that statement, and the trial court overruled the objection. However, when the state renewed its closing argument, it did not go back to that same argument.

In his brief to this court, the defendant argues that he is entitled to a new trial because the state's conduct violated La.Code Crim.P. arts. 770, 774, and 775, which address prejudicial remarks as a basis for mistrial. However, the defendant did not request a mistrial when the comments were made, and the articles do not apply to a new trial issue. Furthermore, even though the state mistakenly told the jury that Mr. Dickerson had been excluded as a DNA contributor, we find this to be harmless error. The overwhelming evidence establishes that the defendant was the contributor of the sole male DNA profile found in the victim's vaginal and rectal swabs. The state's comments did not likely contribute to the jury's verdict, and we find no merit in this assignment of error.

### *Assignment of Error Number Five*

In this assignment of error, the defendant argues that the trial court erred in allowing the state to introduce the coroner's report into evidence.

A coroner's report is admissible to prove the fact and/or cause of death, but it is not competent evidence of any other fact. La.Code Crim.P. art. 105. It is admissible as an exception to the hearsay rule because it does not offer proof of guilt or innocence and does not implicate the accused. *State v. Russell*, 42,479 (La.App. 2 Cir. 9/26/07), 966 So.2d 154, *writ denied*, 07-2069 (La. 3/7/08), 977 So.2d 897.

18

The coroner's report in this matter established that the cause of death was the gunshot wounds Ms. Wood sustained, but it went further to theorize that Ms. Wood was "probably raped" despite a finding of "no evidence of cervical trauma or vaginal tears." Because of this finding in the coroner's report, the state continually referred to Ms. Wood as both a murder and rape victim.

The defendant first asserts that it is error to allow the coroner's report to be introduced at all when the coroner is unavailable for examination on the report.[17] We find no merit in this argument. In *Russell*, as in the matter before us, the autopsy report was cumulative evidence of the victim's death and its cause. The *Russell* court determined that the defendant's statutory and constitutional rights were not substantially violated because the death and its cause were uncontroverted.

Next, the defendant argues that the report should not have been admitted because it denied him his constitutional right to cross-examine the coroner on the rape findings. We agree with the defendant's argument that La.Code Crim.P. art. 105 does not authorize the use of the coroner's report to establish elements of a rape in that it does deny him his constitutional right to cross-examination. United States Constitution Amendment VI protects an individual's right to confront testimonial evidence against him "and to subject [witnesses'] testimony to rigorous testing in an adversary proceeding before the trier of fact." *State v. Stewart*, 45,333, p. 18 (La.App. 2 Cir. 8/11/10), 46 So.3d 714, 725, *writ denied*, 10-2145 (La. 9/30/11), 71 So.3d 273 (citing *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930 (1970); *State v. Kennedy*, 05-1981 (La. 5/22/07), 957 So.2d 757, *reversed in part on other grounds*, *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641

---

[17] It appears from the record of this matter that the coroner who prepared the report died prior to trial.

(2008)). The use of the report to establish elements of a rape violated the defendant's right in that respect. Still, "[c]onfrontation errors are subject to the harmless error analysis, so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error." *Id.* (citing *State v. Broadway*, 96-2659 (La. 10/19/99), 753 So.2d 801, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000)).

In this case, the defendant was convicted of second degree murder, a violation of La.R.S. 14:30.1. For the jury to have convicted the defendant of that offense, it had to have found that the state established beyond a reasonable doubt that the defendant killed Ms. Wood and that he either had the specific intent to kill her or inflict great bodily harm or that he committed the offense during the commission of another felony, including aggravated or forcible rape. *Id.* The record does not indicate the finding on which the jury based its verdict.

In *State v. Patorno*, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, the trial court instructed the jury that it could either find that the defendant charged with second degree murder had the specific intent to kill or inflict great bodily harm on the victim or that he killed the victim during the perpetration of a listed felony. After his conviction, the defendant argued on appeal that ten jury members required to convict "may not have reached the necessary agreement to support a second degree murder conviction under the same theory" based on the evidence and the jury instructions. *Id.* at 148. The first circuit held that "a jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternate theories. Thus, a conviction can be upheld if there is sufficient evidence based on either of the alternate theories with which the jury is charged." *Id.* at 149 (citations omitted).

20

Here, the record does not indicate the theory under which the jury convicted the defendant of second degree murder. If the verdict was based on felony murder, the only evidence at trial pertaining to rape was the autopsy report. Thus, the autopsy report would be the basis for more than proof of the fact and cause of death. However, evidence other than the autopsy report was sufficient to show that the killer had the specific intent to kill the victim or inflict great bodily harm on the person of Ms. Wood. The jury convicted the defendant of the offense and, based on the holding in *Patorno*, 822 So.2d 141, we find that evidence was sufficient for the jury to convict him on the specific intent theory of the offense. Thus, while we find that the trial court erred in allowing the coroner's report to be introduced into evidence, we find this to be harmless error. We find no merit in this assignment of error.

### *Assignment of Error Number Six*

In this assignment of error the defendant asserts that the trial court erred in not allowing him to present an alternative theory of defense. Specifically, he asserts that trial court erred in prohibiting him from questioning Gary Cheramie about his relationship with the victim, thereby establishing the possibility of Mr. Cheramie's involvement in her death.

Mr. Cheramie testified that a window next to the front door of the apartment had been broken prior to the fire and that he cut himself on it during an argument with Ms. Wood. While denying that he and Ms. Wood had a bad personal relationship, he acknowledged that he and Ms. Wood's relationship was not totally stable. Specifically, he testified to a dispute between him and Ms. Wood, which resulted in Ms. Wood temporarily leaving and moving into an apartment with another man. This, according to Mr. Cheramie, occurred approximately one month

21

before her death. According to Mr. Cheramie, the basis of the dispute was the fact that Ms. Wood was a "very flirtatious girl" and that he suspected she was seeing other men when he was offshore. Law enforcement personnel were involved in some of the disputes between Mr. Cheramie and Ms. Wood.

The defendant construed the state's use of Mr. Cheramie as an attempt "to give [the jury] the impression that this was a great relationship, everything was perfect" and that this was not true. However, the trial court questioned the defendant's position on the relationship given the complete lack of evidence to establish that Mr. Cheramie was anywhere other than offshore at the time of the offense. The defendant acknowledges that he cannot establish that Mr. Cheramie was not offshore, but that Mr. Cheramie's sister had given a statement that she knew someone in the mafia, and the defendant believed that Mr. Cheramie was in a position to have someone rape or harm the victim. Specifically, the defendant saw relevance in the evidence suggesting that Ms. Wood had sexual relations with other men after the confrontation with Mr. Cheramie.

In fact, the defendant successfully established to the jury that Ms. Wood had sexual relations with men other than Mr. Cheramie and that she left Mr. Cheramie on at least one occasion and spent the night with another man. Additionally, Mr. Cheramie acknowledged in his testimony that he told law enforcement officers that other men had visited his apartment while he was away. Thus, Mr. Cheramie's testimony did not give an impression of a perfect relationship, the defendant had no evidence to suggest that Mr. Cheramie was not offshore at the time of the

offense,[18] and the defendant failed to call Mr. Cheramie's sister as a witness despite the fact that she was at the trial.[19]

We find no merit in this assignment of error.

### *Assignment of Error Number Seven*

The jury convicted the defendant of second degree murder by a ten to two verdict, and in his final assignment of error, the defendant argues that the trial court erred in allowing him to be convicted by less than a unanimous verdict. He acknowledges that La.Code Crim.P. art. 782(A) requires ten jurors to concur in a verdict of second degree murder, but still argues that we should find that provision unconstitutional.

We decline to do so. The Louisiana Supreme Court has repeatedly held La.Code Crim.P. art. 782 to be constitutional. *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738; *State v. Jones*, 381 So.2d 416 (La.1980); *State v. Simmons*, 414 So.2d 705 (La.1982); *State v. Edwards*, 420 So.2d 663 (La.1982). We find no merit in this assignment of error.

### DISPOSITION

For the foregoing reasons, we affirm the defendant's conviction in all respects.

**AFFIRMED.**

---

[18] In fact, other evidence clearly established that he was offshore at the time of the offense.

[19] Tillman Cheramie, Gary Cheramie's father, testified that his daughter was present in the courtroom at the time of his testimony. Assuming this daughter is also the sister with mafia connections, she was available to testify at trial, but was not called as a witness.